E-FILED
Wednesday, 15 July, 2026  03:37:17 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

LORI R.,

    *Plaintiff,*

v.

FRANK BISIGNANO, Commissioner of
Social Security,

    *Defendant.*

Case No. 1:25-cv-01366-RLH

## ORDER & OPINION

Plaintiff Lori R. ("Lori") filed this suit to challenge an administrative law judge's finding that she was not disabled under the Social Security Act and thus ineligible for benefits. The parties have consented to final disposition of this case by a U.S. magistrate judge. (Doc. 10.) Because the ALJ's step-two conclusion was supported by substantial evidence, the Court affirms.

## LEGAL STANDARD

### I.    The Social Security Act

The Social Security Act—and the regulations adopted under it—explain in detail who is eligible to receive social security benefits. To qualify, a claimant must be sixty-five years of age, blind, or disabled. 20 C.F.R. § 416.202(a)(1)–(3). A claimant is disabled if she cannot "do any substantial gainful activity" because she suffers from "any medically determinable physical or mental impairment" that is either life-threatening or chronic. 42 U.S.C. § 423(d)(1)(A).

To implement that definition, the Social Security Administration has developed a five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(1). The steps proceed sequentially:

> **Step One.** Is the claimant currently engaged in substantial gainful activity?
>
> **Step Two.** Does the claimant have a severe mental or physical impairment—i.e., an impairment that significantly limits their ability to do basic work activities—or a combination of them?
>
> **Step Three.** Does the mental or physical impairment appear on an enumerated list (called "listings")? If not, is it nonetheless medically equal to one of those listings?
>
> **RFC Assessment.** What is the claimant's residual functional capacity (RFC)—that is, the most they can still do despite their limitations?
>
> **Step Four.** Based on the claimant's RFC, can they perform their past work?
>
> **Step Five.** Based on the claimant's RFC, can they perform other work?

*See id.* § 416.920(a)(4)(i)–(v). The ALJ begins, of course, at step one. If it yields an affirmative answer (i.e., the claimant is working), the claimant is not disabled, and the inquiry ends. If step two yields a negative answer (i.e., the claimant does not have a severe impairment), the claimant is not disabled, and the inquiry ends. *See id.* §416.920(a)(4)(i)–(ii). Step three, however, is dispositive: If the claimant's impairment appears on a listing, the claimant is considered disabled and eligible for benefits. *See id.* § 416.920(a)(4)(iii). If the claimant's impairment does not appear on or medically equal a listing, the ALJ crafts an "RFC Assessment," which analyzes "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [their] impairment." *Moore v. Colvin*, 743 F.3d 1118, 1121

(7th Cir. 2014). If either steps four or five yield an affirmative answer (i.e., the claimant can perform their old job or adjust to a new one in light of the RFC), the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv)–(v).

The claimant has the burdens of production and persuasion through step four. *See Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). At step five, the burden shifts to the Commissioner to show that the claimant can engage in some type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

## II.    Standard of Review

A court's function on review is limited to determining whether the ALJ's findings are supported by substantial evidence and based upon proper legal criteria. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence, in turn, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (explaining that the threshold "is not high"); *Schneck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) ("Substantial evidence may be less than the weight of the evidence, and more than a scintilla." (citation modified)). Yet, while the ALJ's decision commands deference, courts may not simply "rubber stamp" it. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

3

The Seventh Circuit has emphasized that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). Instead, ALJs need only "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review.'" *Id.* at 1054 (alteration in original) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary"—not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, courts reviewing for substantial evidence may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [their] judgment for the ALJ's determination so long as substantial evidence supports" the decision under review. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In short, the ALJ must build "an accurate and logical bridge" between the evidence in the record and his conclusions. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

## BACKGROUND

### I.    Lori

Lori was born in 1965. (R. at 77[1].) She was awarded her high-school equivalency in January 1985, and from June 1999 to September 2021 worked as a self-employed carpenter. (R. at 258.) On a function report that Lori completed as part of her application process, she claimed that she is unable to work because of persistent anxiety, depression, and grief. (R. at 279.) At the hearing, she testified that she experiences an anxiety or panic attack once per day, (R. at 99–100); that her concentration is "very focused," (R. at 101); that she experiences a lack of motivation and difficulty sleeping, (R. at 101); and that she has a history of problems with her appetite, (R. at 102). She also testified that she does not believe she could work in a retail setting because she would not be able to interact appropriately with strangers. (R. at 103).

### II.    Procedural History

Lori applied to the Social Security Administration for disabled widow's benefits in March 2023, alleging that she has been disabled since September 19, 2021. (R. at 53.) Her application was initially denied in March 2024 and denied upon reconsideration the following September. (R. at 53.) She then requested a hearing before an ALJ, (R. at 53), which took place in February 2025, (R. at 79). Present at the hearing were Lori, her attorney, and a vocational expert. (R. at 79.)

---

[1] "R." refers to the Certified Administrative Record filed on November 6, 2025. (Doc. 8.) The page numbers cited in this Order refer to the black page numbers at the bottom right of each page of the transcript rather than the green page numbers generated automatically by CM/ECF at the top right.

After the hearing, the ALJ issued a written opinion concluding that Lori was not disabled and therefore not entitled to benefits. (R. at 66.) In response, Lori sought review of the ALJ's decision with the Appeals Council, but her request was denied. (R. at 8.) Lori then filed a complaint in this Court to challenge the ALJ's decision. (Doc. 1). The case was stayed in early October pending a lapse in government appropriations, and the stay was lifted two and a half weeks later. (Text Order dated Oct. 24, 2025.) Lori filed her brief in April 2026, (Doc. 13), and the Commissioner responded, (Doc. 17).

### III.    The ALJ's Decision

In his opinion, the ALJ used the five-step evaluation process outlined above to determine whether Lori was disabled. At step one, he determined that Lori "is the unmarried widow" of a "deceased insured worker and has attained the age of 50." (R. at 55.) He therefore concluded that Lori "met the non-disability requirements for disabled widow's benefits set forth in" the Social Security Act. (R. at 55.) He then concluded that Lori had "not engaged in substantial gainful activity" since September 19, 2021—the date Lori alleged that she became disabled. (R. at 56.) At step two, the ALJ found that Lori had six medically determinable impairments: "Depressive Disorder, Anxiety Disorder, Borderline Personality Disorder, Hypertension, Gastroesophageal Reflux Disease, and Lacquer Cracks of Myopic Chorioretinal Degeneration." (R. at 56.) The ALJ then proceeded to analyze whether any of those impairments, alone or in combination, are severe—that is, whether they have significantly limited Lori's ability to perform basic work activities for twelve

6

consecutive months. (R. at 56.) After detailing Lori's testimony, the medical evidence, and the relevant opinions, the ALJ concluded that Lori did not suffer from a severe impairment. Based on that step-two conclusion, the ALJ found that Lori was not disabled.

## DISCUSSION

Lori challenges the ALJ's step-two conclusion that her mental impairments were not severe. She argues that it was not supported by substantial evidence because the ALJ mischaracterized the record and misapplied the *de minimus* standard applicable to the step-two analysis. The Commissioner responds that the ALJ's finding was consistent with each of the state-agency examiners and therefore supported by substantial evidence. The Court first details the legal framework that governs step two of the evaluation process before turning to Lori's specific challenges.

## I.    Legal Standard Applicable to Step Two

Step two of the sequential evaluation process asks whether the claimant has a severe impairment, meaning an impairment that "significantly limits" their "physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). It "is a *de minimis* screening for groundless claims intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016). That threshold test is "generally regarded as an easy-to-meet" one. *Dory L. v. Saul*, No. 19-cv-50106, 2020 WL 5763612, at *3 (N.D. Ill. Sep. 28, 2020). The question this Court must answer, however, is not whether Lori's claim was in fact groundless. *Cf. Gedatus*, 994 F.3d at 900 (emphasizing that courts are not to engage in de novo review under §406(g)). Instead, the question is whether the ALJ

could have reasonably concluded that Lori's mental impairments are non-severe—
that is, that they only minimally impact her capacity to perform basic work activities.
*See Biestek*, 587 U.S. 97, 103 (2019) (explaining that the substantial-evidence
threshold "is not high").

Courts asking that question have, of course, arrived at different conclusions
based on the facts before them. *See id.* at 108 (explaining that the substantial-
evidence inquiry must be conducted on a "case-by-case" basis). In *Dory L.*, for
example, the ALJ concluded that none of the claimant's psychological impairments
were severe and thus did not proceed beyond step two. 2020 WL 5763612, at *3. The
court reversed that finding, however, because "[t]here was no medical opinion
supporting the ALJ's decision" and because the ALJ "ignored" various lines of
evidence that would have compelled a different conclusion. *Id.* at *4–5. By contrast,
in *Laron A. v. Bisignano*, the court affirmed the ALJ's step-two rejection. No. 25-cv-
4260, 2026 WL 296570, at *3 (N.D. Ill. Feb. 4, 2026). The court emphasized that,
although the step-two bar is low, the claimant "nevertheless has the burden of
proving that his impairments were more than minimal." *Id.* at *2 (quoting *Kelly v.
Colvin*, No. 24-1587, 2025 WL 25959, at *4 (7th Cir. Jan. 3, 2025)). The *Laron* court
found that the claimant had failed to satisfy that burden, reasoning that "the ALJ
cited to specific and substantial evidence in the record" to support her finding that
the claimant did not suffer from any impairments that—alone or in combination—
significantly limited her ability to perform basic work activities. *Id.* at *3.

Lori argues that the ALJ here failed to support his step-two conclusion with substantial evidence. The Court addresses each of her arguments in turn.

## II.   Whether the ALJ Conflated Steps Two and Four

Lori first argues that the ALJ "improperly conflated Step Four with Step Two." (Pl. Br. 9[2].) If true, that would of course be reversible error: those steps ask fundamentally different questions and impose wildly different standards. Again, step two asks whether a claimant suffers from a severe impairment, *see* 20 C.F.R. § 416.920(c); step four asks whether a claimant can perform their past work in light of their RFC, *see id.* § 416.920(a)(4)(iv). But that is not what the ALJ here did. He did not proceed past step two, and he did not purport to ask whether Lori could perform her past work as a carpenter. Nor could he have: because he did not perform an RFC analysis, he could not possibly have concluded whether Lori's RFC enabled her to perform her previous work. (*See* R. at 56 (concluding that Lori "does not have an impairment or combination of impairments that significantly limits his [sic] ability to perform basic work activities").)

Lori next observes that she was diagnosed with depression. (Pl. Br. 9.) She argues that depression is *ipso facto* a severe impairment, and that the ALJ erred in concluding otherwise. Lori cites two cases to support this contention, so the Court turns there. In *O'Connor-Spinner*, the claimant had been diagnosed with "major depression, recurrent *severe*." 832 F.3d at 697. The ALJ nonetheless concluded that the diagnosis was not a severe impairment "based on the opinions of two state-agency

---

[2] "Pl. Br." refers to Lori's opening brief, filed April 7, 2026. (Doc. 13.)

psychologists who did not even examine, let alone treat," the claimant. *Id.* The court characterized this finding as "nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'" *Id.* (citing Am. Psychiatric Assn', *Diagnostic & Statistical Manual of Mental Disorders*, p. 679–80 (4th ed. text revision 2000)). And in *Joseph S. v. Kijakazi*, the court reached a similar conclusion: the ALJ erred in concluding that the claimant's depression was a non-severe impairment. No. 20-cv-3866, 2022 WL 1185207, at *2 (N.D. Ill. Apr. 21, 2022). That was particularly true, the court found, because the ALJ "relied on an outdated, consultative medical opinion"—rather than the claimant's own treating sources. *Id.*

Here, as in *Joseph* and *O'Connor-Spinner*, Lori was diagnosed with, among other things, "major depressive disorder, severe with anxiety." (R. at 58.) But that does not end the inquiry. A diagnosis of severe depressive disorder does not, in and of itself, require the ALJ to conclude that the claimant's depression is a severe impairment under the regulations. *Joseph* and *O'Connor-Spinner* illustrate the point. In *O'Connor*, for instance, the court found the ALJ's opinion "replete with examples of cherry-picking evidence supporting his finding while ignoring contrary evidence." 832 F.3d at 697. He "said nothing about progress notes from treatment providers that document serious symptoms," and "singled out the one record" documenting improvement. *Id.* In short, the ALJ ignored a "plethora of evidence" that suggested the claimant's depression was severe. *Id.* at 698. Likewise, in *Joseph*, the ALJ's step-

10

two analysis "relied on an outdated, consultative medical opinion." 2022 WL 1185207, at *2. Overall, the court found, "the medical record" and the claimant's testimony "demonstrates that his depression had a greater than minimal impact on his daily activities." *Id.* Accordingly, *Joseph* and *O'Connor-Spinner* do not establish a legal rule that major depressive disorder is always severe. Instead, they stand for the well-settled proposition that an ALJ cannot ignore a line of medical evidence when concluding that it is not. *See Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (emphasizing that an ALJ cannot "ignore an entire line of evidence contrary to her conclusion").

Lori also suggests that the ALJ here committed the same error as the ALJ in *Joseph*—that is, he erroneously based his step-two conclusion "on the non-examining review opinions in the record." (Pl. Br. 9.) On Lori's telling, those opinions were "outdated" because the "examiners did not have the opportunity to review a majority of" Lori's "outpatient mental health records which confirmed her diagnosis." (Pl. Br. 9.) But Lori fails to substantiate that claim. Indeed, both state-agency psychological consultants found that Lori possessed "no severe psychological impairments." (R. at 65.) And the ALJ found these assessments "persuasive" because they were "well-supported by explanation and references to the record" and "consistent with the record showing pretty minimal specialized treatment for [Lori's] anxiety, depression, borderline personality disorder, and PTSD." (R. at 65.)

Lori does not explain what evidence—if any—undermines that finding. True, Lori points to evidence that she was diagnosed with depression. (Pl. Br. 9 (citing R.

11

at 410, 434, 673, 744, 757, 1152, 1181, 1196).) But it is far from self-evident how—if at all—those records undermine the state-agency psychologists' or the ALJ's conclusions. And indeed, some records in fact seem to support them. (*See, e.g.*, R. at 744 (Lori stated that her "anxiety and depression are slightly worse right now because her son and his girlfriend are staying with her" but that Lori otherwise denied suicidal ideation); R. at 1152 (explaining Lori's depression and symptoms but suggesting that it may be "situational as she is struggling more with money and talking with exes").) Accordingly, the records Lori cites do not cast doubt on the validity of the state-agency psychological opinions nor the ALJ's. And although some evidence may support a contrary conclusion, this Court cannot reverse simply because it may disagree. *See Herr*, 912 F.2d at 181.

## III.    Whether the ALJ Reasonably Concluded that Lori's Mental Impairments Only Minimally Impacted Her Activities

Lori next argues that the ALJ's step-two analysis improperly focused on her functional limitations and, in doing so, "put the cart before the horse." (Pl. Br. 9.) Quoting *Meuser v. Colvin*, Lori maintains that "[a]n assessment of the functional limitations caused by an impairment is more appropriate for Steps 4 and 5, not Step 2." 838 F.3d 905, 910 (7th Cir. 2016).) Maybe so. But *Meuser* expressly declined to "resolve this issue" because the ALJ in that case "made other errors that alone" warranted reversal—for instance, the ALJ "fundamentally misunderstood" the nature of schizophrenia; "ignored several notations" in the medical record; and improperly "discard[ed]" the opinion of a treating physician. *Meuser*, 838 F.3d at 912.

12

Thus, *Meuser* does not warrant remand simply because the ALJ assessed functional limitations at step two. Nor should it, for step two *requires* the ALJ to ask whether a claimant's impairments "significantly limit" their "physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). And that question, in turn, requires *some* assessment of a claimant's functional limitations: How could a claimant's ability to do "basic work activities" be determined without reference to their functional limitations? The Court thus declines to adopt a reading of *Meuser*'s dicta that would conflict with the governing regulations.

## IV. Whether the ALJ Mischaracterized the Record and Misunderstood the Nature of Mental Impairments

Lori next argues that the ALJ mischaracterized both the record and the nature of mental health treatment. (Pl. Br. 10.) She observes—correctly—that mental health treatment is often provided in different ways. Some receive inpatient treatment, while others receive outpatient treatment; sometimes patients are prescribed medication, while others receive only psychological treatment. And some, like Lori, receive treatment along various modalities. (Pl. Br. 10.) Lori then points to evidence of her treatment (some of which was provided on an emergency basis), the side effects of her medication, and the fluctuations in her symptoms. And she cites a litany of evidence showing that she "often presented with a depressed mood and/or pressured speech and at times presented with fair attention, untidy clothing, withdrawn affect, and/or fair insight." (Pl. Br. 10.) This evidence, Lori insists, "undermines and invalidates that [sic] ALJ's assertions." (Pl. Br. 10.)

13

The question, then, is whether Lori has identified "an entire line of evidence contrary to" the ALJ's conclusion that Lori's mental impairments were non-severe. *Thomas*, 745 F.3d at 806. The answer is no. To begin, the ALJ recognized that "the record indicates that [Lori] has a history of anxiety, depression, PTSD, and borderline personality disorder." (R. at 63.) He then recounted Lori's testimony that she experiences daily panic attacks and does not believe that she could return to work. (R. at 63.) The ALJ nonetheless found that Lori's "mental health symptoms have not been as intrusive or as limiting as he [sic] has alleged to the SSA." (R. at 64.)

The records Lori cites do not undermine that finding. For instance, the treatment records Lori cites overwhelmingly support the ALJ's conclusion that Lori's exams "consistently revealed her ability to maintain largely intact mental functioning" despite her diagnoses. (*See, e.g.*, R. at 675 (reporting that Lori's mood was stable); R. at 678 (same); R. at 680 (same); R. at 681 (reporting that her mood was positive); R. at 683 (reporting that Lori's symptom management was "going well"); R. at 685 (reporting that Lori's mood was stable); R. at 686 (reporting that Lori was "engaged" and "able to reflect"); R. at 687 (reporting that "things are good" and that Lori was "no longer frustrated); R. at 689 (reporting that Lori's "depression has been manageable"); R. at 695 (reporting that Lori's mood was stable); R. at 700 (same); R. at 702 (same, and denying medication side effects); R. at 759 (same).) True, some evidence pointed the other way. (*See, e.g.*, R. at 425 (Lori experiencing suicidal ideation); R. at 672–74 (records indicating that Lori was not eating); R. at 692 (indicating that Lori has experienced "high levels" of depression but that it is

14

improving); R. at 744 (Lori's symptoms were "slightly worse").) Likewise, the record supports both the presence and absence of suicidal ideation. (*Compare* R. at 421, 554, *with* R. at 422, 435.)

In short, this is not an instance where the ALJ ignored an entire line of evidence that undermined the conclusion that Lori's mental symptoms were not severe. The evidence instead largely supports that finding. And again, where reasonable minds can differ, this Court must affirm. *See Herr*, 912 F.2d at 181.

Lori also argues that the ALJ's opinion reflects a "fundamental misunderstanding of the nature of chronic mental impairments." (Pl. Br. 11.) She observes, correctly, that mental-health symptoms tend to fluctuate. And she argues that the ALJ wrongly demanded dramatic changes in her mood and functioning. True, the ALJ speculated that the adjustments in Lori's medication "did not appear to result from dramatic changes in mood/functioning or result from a sustained loss of function." (R. at 63.) But that observation did not drive the ALJ's analysis, which must be read in context and "as a whole." *Shirley W. v. Comm'r of Soc. Sec.*, No. 1:23-cv-1181, 2024 WL 2337666, at *3 (C.D. Ill. Apr. 25, 2024). Although the ALJ acknowledge that Lori received inpatient care following the death of her husband, (R. at 59), he nonetheless interpreted the longitudinal record to show that Lori's treatment was mostly "conservative," (R. at 65); that her mental status examinations were "largely normal," (R. at 66); that she consistently showed "good mood stability," (R. at 66); and that she "denied mood swings, irritability, anger, auditory or visual hallucinations, [and] suicidal or homicidal ideations," (R. at 66). After reviewing the

record, the ALJ thus agreed with both state-agency consultants that Lori's mental health impairments did not "significantly limit" her ability to perform basic work activities and were therefore not severe. (*Compare* R. at 56 (ALJ conclusion), *with* R. at 126 (state-agency opinion at the initial level), *and* R. at 133 (state-agency opinion on reconsideration).) Because that conclusion did not ignore a line of evidence refuting it, the Court must affirm. *See Thomas*, 745 F.3d at 806

## V.    Whether the ALJ Selectively Analyzed Lori's Daily Activities

Finally, Lori argues that the ALJ "selectively rel[ied]" on her activities of daily living to "discredit the severity of her mental impairments." (Pl. Br. 12.) She observes that her ability to perform "activities of daily living independently at times" "did not show that" she "could meet the demands of performing work on a full-time competitive basis without any limitations." (Pl. Br. 12.) But that's not the standard. The question is not whether Lori could perform work *without any limitations*; it's whether Lori had carried her burden to show that she suffered from a mental impairment that "significantly limited" her ability to do basic work activities. 20 C.F.R. § 416.920(c). The ALJ answered that question in the negative and—for reasons discussed—his conclusion was supported by substantial evidence.

True, as Lori observes, the ALJ did say that she "is independent in her activities of daily living, does her own grocery shopping, and occasionally helped care for her granddaughter." (R. at 65.) But the ALJ discussed those activities in the context of Lori's *physical* impairments, not her mental ones. And Lori has not challenged the ALJ's finding that she did not suffer from any severe physical

16

impairments. The argument has therefore been waived. *See Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). Even so, the ALJ's step-two conclusion did not rise or fall on his discussion of Lori's daily activities. Instead, as the ALJ explicitly noted, those activities dovetailed with the other evidence demonstrating that Lori suffers from no severe physical impairments. (*See* R. at 65.) Of course, an ALJ is entitled to rely on a claimant's daily activities as one factor in determining the severity of their impairments. Lori cites no authority to the contrary.

## CONCLUSION

IT IS THEREFORE ORDERED that the ALJ's decision be AFFIRMED. The Clerk is DIRECTED to enter judgment and close this case.

*So ordered.*

Entered this 15th day of July 2026.

s/ Ronald L. Hanna

Ronald L. Hanna
United States Magistrate Judge